28 So.2d 637

**TUCKER et al. v. TUCKER et al.**

5 Div. 413.

Supreme Court of Alabama.

Dec. 5, 1946.

Rehearing Denied Jan. 23, 1947.

Denson & Denson, of Opelika, and Chas. E. Fuller, of LaFayette, for appellants.

Jacob A. Walker, of Opelika, and Hines & Hines, R. C. Wallace and D. W. Jackson, all of LaFayette, for appellees.

LIVINGSTON, Justice.

This is a review of proceedings to contest the probate of the alleged last will and testament of James A. Tucker.

James A. Tucker, long a resident of Chambers County, Alabama, died on August 7, 1945, seized and possessed of an estate valued at more than $250,000, and located, in the main, in Chambers County. He was never married and left surviving no father or mother. He had three brothers and four sisters, namely, John M. Tucker, Joseph S. Tucker, William M. Tucker, Maggie Tucker Webb, Janie Tucker Pearson, Sarah Tucker Hart, and Leila Tucker Gaines. None of his sisters, and only one brother,

William M. Tucker, survived him. Joseph S. Tucker was never married, while John M. Tucker and the four named sisters all had children who survived James A. Tucker.

The nieces and nephews surviving James A. Tucker were John J. Tucker, W. Henry Tucker, Bessie T. Torbert, and Mary J. Ordway, sons and daughters of John M. Tucker, deceased; Ada Pearson Nichols, Maggie Pearson Frazer, Anna Pearson Fuller, and Sallie Kate Pearson Alsobrook, daughters of Janie Tucker Pearson, deceased; Walter Hart and Bettie Hart Noel, son and daughter of Sarah Tucker Hart, deceased; Will Gaines Holmes and Mamie Gaines Germany, children of Leila Tucker Gaines, deceased; William H. Webb and Joe T. Webb, sons of Maggie Tucker Webb, deceased. Mrs. Webb was living at the time James A. Tucker executed his alleged will.

On November 5, 1938, the said James A. Tucker executed an instrument purporting to be his last will and testament. By this instrument he devised and bequeathed all of his property to his brother John M. Tucker, provided the said John M. Tucker was living at the time James A. Tucker died, and in the event John M. Tucker died prior to the death of James A. Tucker, all of his property was devised and bequeathed to the two sons and two daughters of John M. Tucker, and who are named above. The instrument nominated and appointed John M. Tucker executor, and relieved him from making bond, filing inventories, making returns or settlements, etc., and provided further that in the event John M. Tucker predeceased James A. Tucker, John J. Tucker and W. Henry Tucker should act as executors with the same powers, privileges and immunities granted John M. Tucker. John M. Tucker died in 1943.

On August 16, 1945, John J. Tucker and W. Henry Tucker filed their petition in the probate court of Chambers County seeking to probate the will. On said date the court made and entered an order setting the petition down for hearing on September 13, 1945, and directed notice to the next of kin. On September 13, 1945, when the petition came on for hearing all of the

next of kin of James A. Tucker, deceased, except the children of John M. Tucker, and a nephew William H. Webb and a niece Mrs. Anna P. Fuller, filed their written contest of the alleged will, and demanded that the same be transferred to the circuit court, and there tried by a jury. The probate court made and entered the order prayed for.

The trial in the circuit court resulted in a verdict and judgment for contestants, and the proponents of the will prosecute this appeal.

The pivotal question is the testamentary capacity of James A. Tucker as of November 5, 1938, the day on which he executed the instrument alleged to be his last will and testament.

█ If the testator possessed at the time of the execution of the instrument offered for probate sufficient mentality to understand the business about which he was engaged, the kind and extent of the property devised, and the persons who were the natural objects of his bounty, and the manner in which he desired the disposition of his property to take effect, his will is valid. Houston v. Grigsby, 217 Ala. 506, 116 So. 686; Eastis v. Montgomery, 95 Ala. 486, 11 So. 204, 36 Am.St.Rep. 227 (see, also, 19 Ala.Dig., Wills, ⊙⇒50, p. 443).

█ Sanity being the normal condition of the human mind, the law presumes that every person of full age has sufficient mental capacity to make a will, and casts on the contestant, in the first instance, the burden of proving mental incapacity at the time the will was executed, but, when the contestant has established habitual, fixed or permanent insanity, as distinguished from spasmodic or temporary insanity at a time prior to making the will, the burden of going forward with the evidence is then shifted to the proponents, and they are required to show that the will was executed during a lucid interval. O'Donnell v. Rodiger, 76 Ala. 222, 52 Am.Rep. 322; McBride v. Sullivan, 155 Ala. 166, 45 So. 902; Houston v. Grigsby, 217 Ala. 506, 508, 116 So. 686.

The following facts are not controverted. James A. Tucker moved to Lafayette, Alabama, about the year 1898. He went to live in the home of his sister Mrs. Gaines,

and he lived there until Mrs. Gaines died in 1922. For another ten years after the death of Mrs. Gaines he kept and occupied a room at the Gaines' home, but took his meals elsewhere. For a long number of years John M. Tucker, Joseph S. Tucker, and James A. Tucker owned and successfully operated a partnership under the firm name of Tucker Brothers, engaging in a general mercantile and supply business in Lafayette, Alabama. William M. Tucker lives in Florida, but just when he left Chambers County is not shown. John M. Tucker and his four sisters reared their families in or near Lafayette. The record contains no hint of family friction or disunity until the death of Joseph S. Tucker in 1938. To the contrary, we think it fairly discloses a devoted family.

Joseph S. Tucker died on or about September 2, 1938, leaving an estate worth not less than $750,000. With the exception of special bequests, aggregating approximately $100,000, Joseph S. Tucker willed his estate to his brother John M. Tucker, with the provision that said estate was to go to the four children of John M. Tucker if John M. Tucker was not living at the time of the death of testator, Joseph S. Tucker, or at the death of James A. Tucker, who was to receive one-half of the net proceeds of the estate as long as he lived.

As already stated, James A. Tucker executed the instrument purporting to be his will on November 5, 1938. He was then seventy-three years of age.

James A. Tucker had a stroke of paralysis or apoplexy in January 1936, and it was agreed between the parties that the records of Wheeler Hospital showed that he was confined to that hospital from January 15, 1936, to about May 1, 1936; that he was again admitted to the hospital on May 15, 1937, and discharged June 30, 1937; that he was again admitted to the hospital on October 5, 1941, and remained there until his death on August 7, 1945. Upon being discharged from the hospital in May 1936, he went to the Chambers Hotel to reside, going back to the hospital in May 1937, and when discharged in June 1937, again resided at the hotel until he returned

to the hospital on October 5, 1941. It is not disputed that Mr. Tucker was admitted to the hospital in January 1936 because of a stroke. There is perhaps some conflict as to the cause of his second commitment in May 1937: contestants contending that he suffered another stroke, while proponents contend that it was because of an attack of flu. It is not denied that he died as the result of an intercranial hemorrhage caused by arteriosclerosis. For a time, after his first stay in the hospital, Mr. Tucker was confined to the use of a rolling chair. Later, he was able to walk some, though as said by some witnesses, he walked with great difficulty and dragged or slid one of his feet, and walked with one arm extended. He continued to go to his place of business, more or less regularly, after leaving the hospital the first time until he was admitted to the hospital the last time in October 1941.

The testimony of medical experts as well as that of lay witnesses, is conflicting in respect to the mental soundness of Mr. Tucker at the time he executed the instrument purporting to be his last will and testament. The opposing parties examined many witnesses and the record is voluminous.

We will not attempt a detailed analysis of the testimony (section 66, Title 13. Code of 1940), but will set forth in substance enough to clearly demonstrate the correctness of the trial court's ruling in refusing proponents' written request for the general charge on the question of mental capacity.

Contestants' witness, Dr. W. G. Gaines, qualified as an expert. He was a brother-in-law of Mr. Tucker, and his two daughters were nieces of Mr. Tucker, and contestants of his will, which facts go to his credibility rather than his competency. Mr. Tucker lived in the home of Dr. Gaines for more than thirty years. Dr. Gaines' knowledge of Mr. Tucker's mental condition was acquired both from ordinary personal contact and association, and from professional services rendered. Dr. Gaines testified that he moved away from Lafayette in 1935, but made frequent visits back, and that he saw Mr. Tucker on those

visits; that on or about September 3, 1938, the day after Mr. Joseph Tucker was buried, and some two months before James A. Tucker executed the instrument purporting to be his will, he made a thorough examination of James A. Tucker; that in his professional opinion James A. Tucker was of unsound mind on September 3, 1938, and that his condition continued to deteriorate until he died: that he was of unsound mind on November 5, 1938, the date on which he executed the alleged will. He further gave it as his professional opinion that Mr. Tucker's mental condition was the result of an intercranial hemorrhage induced by arteriosclerosis or hardening of the arteries; and that such a condition did affect his mind. Other medical experts, in answer to hypothetical questions, testified to the same effect.

Many lay witnesses, including nieces and nephews of James A. Tucker, after being properly qualified, testified that, in their opinion, James A. Tucker was of unsound mind on November 5, 1938, the date on which he executed his purported last will and testament. Some of these witnesses testified that at times Mr. Tucker would know them and at other times he would not. That in the same conversation they would have to tell him more than once who they were. His nieces and nephews testified to the same effect. None of the beneficiaries under the will, the children of John M. Tucker, testified in the cause.

Clear enough, the question of James A. Tucker's testamentary capacity was one for the jury.

Appellants' assignments of error 1 and 2 are based on the trial court's ruling permitting contestants' witness John Strickland, a non-expert, to give his opinion as to the mental unsoundness of Mr. Tucker.

The rule is, that to authorize a non-expert to give his opinion of the existence of an unsound condition of mind, he must not only have the opportunity to form a judgment but the facts should be stated upon which it is based. The admission of opinion testimony is an exception to the general rule, and the ends of justice require in all cases where the opinion of a non-expert is admissible to show un-

soundness of mind, that the facts upon which it is predicated be stated. Vaughn v. Vaughn, 217 Ala. 364, 116 So. 427, 428; Burney v. Torrey, 100 Ala. 157, 14 So. 685, 46 Am.St.Rep. 33; Slagle v. Halsey, 245 Ala. 198, 15 So.2d 740. Mr. Strickland testified that he had known Mr. Tucker all his life; that after the death of Joseph S. Tucker in September 1938, he observed that Mr. James A. Tucker was paralyzed; that from then on James A. Tucker recognized him about half the time; that during that period he saw James A. Tucker every two, three or four months; that he saw him in a rolling chair after he had his stroke in 1936, and saw him later on several occasions in 1936; that he saw him in 1936, 1937 and 1938: that he was in Lafayette about every week: "I couldn't tell you just how long it was between times that I did see him. I would say I would go two or three months sometimes may be I wouldn't see him, and, again I would see him around here every week or something like that * * *. I noticed of course that he didn't look like he used to * * * He had of course a kind of starry look in his eyes." The question of competency or qualification vel non of the witness to give an opinion on the subject is a question for the trial court, and its decision will not be reviewed on appeal unless it clearly appears to have been erroneous. McClelland v. Coston, 227 Ala. 267, 149 So. 697; Parrish v. State, 139 Ala. 16, 36 So. 1012; Odom v. State, 174 Ala. 4, 56 So. 913; Melvin v. Murphy, 184 Ala. 188, 63 So. 546. Under our authorities the trial court did not err in permitting Strickland to testify, as indicated.

What we have just said in respect to the qualifications of witness Strickland applies with like effect to the testimony of contestants' witness Frank Fuller, which is made the basis of appellants' assignment of error No. 9. We will not detail the predicate laid for Frank Fuller's testimony. It was sufficient.

Assignment of error No. 3.—Dr. Gaines on direct examination speaking of the death certificate prepared by Dr. Riser on the death of James A. Tucker said: "This says the immediate cause of death was intercranial hemorrhage, due to arteriosclerosis."

"Q. From your own personal diagnosis of his condition as you saw and observed him from 1936, did he from that date have the disease indicated there, arteriosclerosis? A. Yes, I think this certificate is correct."

On cross-examination of Dr. Gaines this occurred:

"Q. You say you think the certificate made by Dr. Riser is acceptable? A. Yes, I would think that is correct * * *.

"Q. Dr. Riser made the certificate, did he? A. Yes.

"Q. And you would think that what he said about the condition would be acceptable?

"Contestants' attorney, 'We object to that.'

"The court, 'I sustain the objection.'"

Dr. Riser had not testified when the foregoing occurred.

If the question was propounded for the purpose of having the answer sustain the credibility of Dr. Riser, it was obviously inadmissible, because no effort had been made to impeach him. He had not testified. See cases cited in 19 Ala. Dig., Witnesses, ☞318, p. 786. On the other hand, if the opinion of Dr. Gaines was sought as to the correctness of the death certificate, no harm came to proponents because Dr. Gaines had already testified twice that in his opinion the death certificate was correct. There was no error to reverse. Supreme Court Rule 45, Code 1940, Tit. 7 Appendix.

Assignments of error 4, 5 and 6 involve the same proposition of law, and we answer them jointly.

Assignment No. 4 is based on the trial court's ruling in permitting Dr. Morgan, admittedly an expert, to answer the following hypothetical question: "Q. I will ask you to state what in your judgment and opinion would be and was the mental condition of a man who at seventy years old and from that time on had a cerebral arteriosclerosis which at the age of seventy had resulted in a cranial hemorrhage and a stroke, and what would be his condition from and after that date and particularly two or three years after that time?"

Assignment No. 6 involves a hypothetical question propounded to Dr. Gay, admittedly an expert, as follows: "Q. I will ask you, Doctor, what in your opinion and judgment as a physician was and would be the mental condition of a man in the fall of 1938 who is approximately seventy-three years old then, and who two or three years previously in early 1936 had had a stroke of paralysis caused by cerebral arteriosclerosis?"

As said in George v. State, 240 Ala. 632, 200 So. 602, 606:

"The hypothetical question propounded to an expert witness should embrace substantially all the facts where there is no dispute as to the facts upon the question of insanity. Parrish v. State, supra [139 Ala. 16, 36 So. 1012]. If the evidence is in conflict as to the facts tending to show insanity, the hypothetical question may and should properly embrace only the facts tending to support the particular theory of the respective parties, and the opposite party, if desirable on cross-examination, may propound questions to him embracing the facts which tend to support his theory. Parrish v. State, supra. The hypothetical question to an expert witness should not contain matter unsupported by a tendency of the evidence. However, in this regard, technical accuracy is not required. It is for the jury to scrutinize the evidence and to determine what part of the question is true or supported by the evidence and what is not, and the adverse party may ask for instructions, that the jury do not accept the facts as true, but that they should determine what facts are in evidence, and that they might disregard the opinion of the expert if not based on facts in evidence. Parrish v. State, supra.

"Expert witnesses may be cross-examined and their opinion obtained based on other states of facts assumed by the party examining them to have been proved upon a hypothetical case; and they may be cross-examined on purely imaginary and abstract questions. Such questions are not only permissible in order to get the opinion of the expert witness upon all possible theories of the case, but they are allowable to test the value and accuracy of the opin-

ion of the witness himself. Clark v. State, 12 Ohio 483, 40 Am.Dec. 481; People v. Sutton, 73 Cal. 243, 15 P. 96; Parrish v. State, supra. * * *"

We are clear to the conclusion that the testimony of Dr. Gaines already in evidence was substantially sufficient upon which to base the questions propounded to Drs. Morgan and Gay. Assignment No. 5 is based on the trial court's refusal to exclude the answer of Dr. Morgan. No error intervened.

Assignments 7 and 8. Over appellants' objection, contestants were permitted to prove that James A. Tucker, on February 26, 1934, permitted a default judgment to be rendered against him for a large sum of money in the case of Federal Land Bank, etc. v. Singer and Tucker, and after Singer had been removed as a party defendant by demurrer. Dr. Gaines had previously testified that Mr. Tucker's condition came on gradually over a period of years. Other evidence tended to corroborate the testimony of Dr. Gaines. On the other hand, appellants' evidence tended to show that Mr. Tucker attended to his business with ability, keenness and skill.

Evidence to show insanity is not confined to evidence of the mental condition of testator at the instant of the execution of the will, though whatever facts are adduced must tend to show the mental state at that moment. By outward acts we read the thoughts, the motives and the emotions, and as one's acts conform to the practices of people of sound mind or contrast therewith we form our judgment of sanity or insanity. Evidence is competent to prove conduct and language at various times and places indicating an unhealthy mental condition, and the more extensive the view the safer is the determination reached.

This Court has held therefore that the issue of insanity gives much latitude to the parties to introduce evidence of testator's acts, declarations and conduct prior and subsequent to the execution of the will. Anderson v. State, 209 Ala. 36, 95 So. 171; Birchfield v. State, 217 Ala. 225, 115 So. 297; Deloney v. State, 225 Ala. 65, 142 So. 432; Cawley v. State, 133 Ala. 128, 32 So. 227; McLean v. State, 16

Ala. 672. See, also, Batson v. Batson, 217 Ala. 450, 117 So. 10; Johnston v. Johnston, 174 Ala. 220, 57 So. 450. There was some probative force under the circumstances of this case in the fact that Mr. Tucker suffered a default judgment to go against him in February 1934. Its weight was for the jury. Appellants can take nothing by assignments 7 and 8.

Assignment of error 10 is based on the trial court's overruling appellants' objection to a hypothetical question propounded to Dr. H. McCullough. We have already stated the governing rule above. Upon consideration of the facts hypothesized we find that they are supported by the tendencies of the evidence admitted on behalf of contestants.

Assignment of error 11 is entirely too general to invite this Court's consideration. It is as follows: "The court erred in allowing witness Sanders to testify, over appellants' objection, in answer to the question as to who was looking after Tucker's bills, as is shown on page 234 of the transcript."

A reference to page 234 shows two objections made by appellants: one made after the question had been answered. See Supreme Court Rule 1, Code 1940, Tit. 7 Appendix; Jackson Lumber Co. v. Butler, 244 Ala. 348, 13 So.2d 294.

Assignment of error No. 12 is predicated on a remark of the trial court during the examination of appellants' witness, Dr. Wheeler. The witness had testified as to laboratory examinations and tests made in Mr. Tucker's case in January 1942. The witness had before him records of the tests. The following occurred:

"Q. What does it show there as the result of the examination of the urine? A. The urine on October 9, 1941, had a specific gravity of 10 – 3, sugar was negative and microscopic examination was negative – albumen negative.

"Mr. Walker: That would throw no light upon the mental condition of Mr. Tucker, if the court pleases.

"Mr. Denson: I would like to ask this question in connection—

"Mr. Walker: I don't think it is hurting.

"The Court: I didn't understand that was hurting your case either, Mr. Walker. But I am ruling of course.

"Mr. Walker: It is just simply to shorten the record if we could.

"The Court: Yes. Proceed."

No objection was made at the time by appellants to this remark of the court or to his ruling. No exception was reserved, and no motion was made to withdraw the case from the jury and declare a mistrial. Grounds 7, 8 and 9 of appellants' motion for a new trial is likewise based on the above remark of the trial court.

■ If the appellants deemed the remark prejudicial, they should have reserved exception thereto, and possibly moved for the case to be taken from the jury. They cannot be allowed to speculate upon a favorable verdict, and failing therein, ask that a new trial be granted them. A motion for a new trial cannot be employed to take the place of an exception which should have been reserved on the trial, if at all. Tobias & Co. v. Treist & Co., 103. Ala. 664, 15 So. 914; Schrimsher v. Carroll, 225 Ala. 188, 142 So. 547; Rutledge v. Brilliant Coal Co., 247 Ala. 40, 22 So.2d 428. See, also, Meinaka v. State, 55 Ala. 47; Schieffelin v. Schieffelin, 127 Ala. 14, 28 So. 687; Campbell v. State, 55 Ala. 80. Moreover, under the particular circumstances of this case we do not think the remark prejudicial.

■ Assignment of error No. 13. Dr. N. A. Wheeler, Jr., a witness for appellants, testified on direct examination that he was part owner of the Wheeler Hospital where Mr. Tucker stayed prior to his death, as shown above. It was also shown that Dr. Wheeler, Jr., and his father Dr. Wheeler, Sr., were Mr. Tucker's attending physicians while he was in the hospital. On cross-examination he was asked the amount of Mr. Tucker's hospital bill between the date of October 5, 1941, and August 7, 1945. The trial court overruled appellants' objection to the question. The evidence was admissible for two reasons: it was clearly within the wide latitude permitted on cross-examination and tended to show witness' interest. It also tended to reflect Mr. Tucker's condition, both as to the time the hospital bill was incurred, and at the time he is alleged to have made his will.

Assignments of error 14 and 15 are predicated upon the trial court's refusal of the affirmative charge for proponents of the will on the question of Mr. Tucker's testamentary capacity. What we have already written clearly indicates that these charges were properly refused.

■ The refusal of appellants' written charge 12 is made the basis of appellants' assignment of error No. 16. The charge is as follows: "The court charges the jury that sanity is the normal condition of the human mind, and the testator in this case is presumed by the law to have been sane when he made the will, unless the contestants have shown to the jury's satisfaction that he was under the disability of habitual or fixed insanity prior to the execution of the will, or that he was not capable of making a will at the time the will was made."

A charge in identical language was condemned in Johnston v. Johnston, 174 Ala. 220, 227, 57 So. 450. The degree of proof required by the instruction was too great. Reasonable satisfaction is the degree required. Moreover, charge 12 was fully and properly covered in the court's oral charge. Supreme Court Rule 45, Code 1940, Tit. 7 Appendix.

■ Contestants' given written charge numbered 5 is the basis of appellants' assignment of error No. 17. The charge is as follows: "The court charges you, gentlemen of the jury, that if in this case James A. Tucker in the will propounded for probate made an unequal treatment of those who ostensibly had equal claims upon his bounty, or if he made preference of some to the exclusion of others, you may look to such circumstances, as well as to the other circumstances in evidence in this case, in determining whether such unequal treatment or exclusion was unnatural. And if from a consideration of said will and the other evidence on this case you are reasonably satisfied that James A. Tucker did make an unnatural disposition of his property in the offered will, then this is a fact to be considered by you in determining his then testamentary capacity."

In Councill v. Mayhew, 172 Ala. 295, 55 So. 314, 315, 318, it is said: "An unequal disposition of property per se raises no presumption of undue influence, nor of testamentary incapacity, nor is it per se unnatural; but the unequal treatment of those who ostensibly have equal claims upon the testator's bounty, or the preference of one to the exclusion of another, may under the circumstances of a particular case, be deemed unnatural. In such a case, an unnatural disposition is a fact to be ascertained and considered by the jury upon either of the issues stated. Gilbert v. Gilbert, 22 Ala. [529], 533, 58 Am.Dec. 268; Burney v. Torrey, 100 Ala. 157, 169, 14 So. 685, 46 Am.St.Rep. 33; Henry v. Hall, 106 Ala. 84, 17 So. 187, 54 Am.St.Rep. 22.

The will of James A. Tucker provides unequal treatment of those who ostensibly had equal claims upon his bounty, or the preference of some to the exclusion of others. He devised and bequeathed all his property to his brother John M. Tucker, provided John M. Tucker survived him, and in the event John M. Tucker did not survive him, then to the four children of John M. Tucker. When the instrument was executed, James A. Tucker had two living brothers and one living sister, and nieces and nephews, other than the children of John M. Tucker. Under the evidence and particular circumstances of this case, the jury could find that the disposition of his property by James A. Tucker was unnatural, and if they did so, that is a fact to be considered by the jury on the issue of testamentary capacity. Councill v. Mayhew, supra; Batson v. Batson, 217 Ala. 450, 117 So. 10; Hale v. Cox, 231 Ala. 22, 163 So. 335. The case of Towles v. Pettus, 244 Ala. 192, 12 So.2d 357, relied on by appellants does not hold to the contrary. In the Towles case, supra, no evidence was introduced from which an inference could be drawn that the disposition of the testator's property was unnatural.

Assignments 18, 19 and 20 are based on the action of the trial court in denying appellants' motion for a new trial.

All of the grounds relied on in the motion for a new trial have been covered above, except that the verdict is contrary to the evidence.

While the evidence in this case was conflicting, there was ample evidence which, if believed, was sufficient to warrant submission of the cause to the jury and to support the verdict rendered. The trial court, who heard the witnesses and observed their demeanor throughout a careful trial, was content to let the verdict of the jury stand. We will not disturb it here.

The cause is due to be and is affirmed.

Affirmed.

GARDNER, C. J., and BROWN and SIMPSON, JJ., concur.

On Rehearing.

PER CURIAM.

Application for rehearing overruled.

All the Justices concur.